Filed 3/25/14  Akopyan v. Bear Trucking, Inc. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STEVE AKOPYAN,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>BEAR TRUCKING, INC., et al.,<br><br>        Defendants and Respondents. | A129566<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVG 03-90370) |

A jury awarded plaintiff Steve Akopyan almost $846,000 in damages in a personal injury action arising out of a trucking accident.  On appeal, his primary claim is that the trial court improperly precluded him from augmenting his expert witness list and from conducting further discovery after the court declared a mistrial on two occasions.

The record on appeal supports a conclusion that the court did not preclude Akoypan from conducting further discovery after the mistrials.  As for the claim that he should have been allowed to designate certain experts to testify after previous trials ended in a mistrial, Akopyan misconstrues case law holding that discovery reopens following a mistrial.  Before the first trial, the court precluded Akopyan from calling designated experts as a sanction for repeated discovery abuses.  Although discovery reopens following a mistrial, it does not follow that the reopening of discovery erases the effect of evidentiary sanctions imposed for repeated instances of misconduct.  Because we reject Akopyan's claims of error, we affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Complaint*

On April 1, 2001, Akopyan was injured in an accident while driving a truck in Mendocino County. He filed a personal injury complaint in Los Angeles County on April 2, 2002, naming Bear Trucking, Inc. (Bear) and Trailmobile Parts & Services Corporation (Trailmobile) as defendants (collectively referred to as defendants).[1] In October 2002, the action was transferred to Mendocino County.

### *Continuance of January 2004 Trial Date*

Trial was originally set for January 12, 2004. All parties timely exchanged expert disclosures by November 24, 2003, in accordance with Code of Civil Procedure section 2034.010 et seq.[2]

In late November 2003, a discovery dispute arose that caused the trial date to be continued. Defendants complained that they had not been given a sufficient opportunity to depose Akopyan, and they argued that the depositions of Akopyan and his designated experts should be completed before the scheduling of the defense experts. The trial court vacated the trial date, extended the discovery cutoff to March 19, 2004, and directed the parties to meet and confer regarding a deposition schedule.

In December 2003, Akopyan's counsel proposed a deposition schedule and subsequently participated in a one-hour telephone conference with defense counsel for the purpose of discussing deposition scheduling. The parties agreed to continue discussions at a later date. Defense counsel thereafter made numerous attempts to coordinate the deposition schedule. Counsel for Akopyan failed to respond to correspondence from defense counsel regarding deposition scheduling, and as of April

---

[1] During the course of this appeal, Essex Insurance Company substituted as a respondent in place of Trailmobile on the grounds that Trailmobile was a de facto dissolved corporation and that Essex Insurance Company was the real party in interest as the insurer of Trailmobile. Unless the context requires otherwise, we will use the term Trailmobile to encompass both Trailmobile and its insurer, Essex Insurance Company.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

2005, Bear's counsel reported that it had received no further correspondence from Akopyan's counsel regarding deposition scheduling and had received no notices from Akopyan's counsel concerning any effort to reschedule a trial date.

### April 2005 Motion to Dismiss for Failure to Prosecute

In April 2005, Bear moved to dismiss the complaint under section 583.410 as a result of Akopyan's failure to bring the matter to trial within three years. (See § 583.420, subd. (a)(2)(A).) Bear argued that Akopyan's counsel had failed to respond to numerous attempts to schedule depositions, that none of the depositions had taken place in the intervening months since the court vacated the trial date, and that Akopyan's counsel had not taken any steps to reschedule the trial. Trailmobile joined in the motion to dismiss.

The trial court heard the motion to dismiss on July 1, 2005. During the hearing, the court stated it was "very close to dismissing this case for failure to prosecute," although it acknowledged such an outcome would be draconian. The court noted that there had been "innumerable and sometimes senseless discovery disputes" in the case, and that nothing had happened in the 18 months since the court ordered the parties to meet and confer. The court expressed frustration that it was "literally at wit's end" with "no confidence in the meet and confer process because this case has just absolutely degenerated." According to the court, the defendants had a right to know what Akopyan's percipient witnesses would say and the nature of the theories espoused by Akopyan's experts. During the hearing, the court stated, "I don't care about disclosure. I'm going to supercede [sic] all of this stuff from [section] 2034 of the Code of Civil Procedure because it's not getting done."

In a written order filed in July 2005, the court denied the motion to dismiss and instead set a deadline for the completion of each side's discovery. As set forth in the order, counsel for defendants were to meet and confer to develop a schedule of depositions they wished to complete. Akopyan's counsel was not to be included in the meet and confer process. All depositions of Akopyan's witnesses were to be completed by October 31, 2005. The court indicated it would dismiss the action if Akopyan failed to produce witnesses noticed for deposition by the defendants. The defendants were to

complete all of their depositions before Akopyan could commence his depositions. The court set a further hearing on November 4, 2005, at which time the court would consider whether its order had been followed and whether the case should be dismissed. The court would also consider at that time scheduling the depositions of defendants' percipient and expert witnesses. Discovery was closed, with the exception of the depositions of percipient and expert witnesses that had already been noticed for deposition.

### *Evidentiary Sanctions*

In September 2005, Bear filed an ex parte application for dismissal of the action based upon Akopyan's failure to produce witnesses. As set forth in the application, on August 11, 2005, defense counsel hand served a notice containing a schedule for deposing Akopyan's designated experts. The first deponent on the schedule was David N. Glaser, M.D., with a scheduled deposition date of August 31, 2005. Dr. Glaser failed to appear for the deposition, as did counsel for Akopyan. Before the scheduled date of the deposition, defense counsel had heard nothing from Akopyan's counsel concerning the deposition. Bear sought to dismiss for failure to comply with the court's July 2005 order.

Instead of dismissing the action, the court issued a lesser sanction of precluding Dr. Glaser from testifying. The court also precluded Akopyan from designating other experts to testify as to the damages-related matters Dr. Glaser was slated to address as an expert, including issues related to brain injury, neurological dysfunction, and psychiatric damages sustained by Akopyan.

In early November 2005, Bear's counsel filed a declaration reporting on the status of efforts to schedule expert depositions. According to the declaration, the parties met and conferred regarding the remaining expert depositions after Akopyan failed to produce Dr. Glaser for the first scheduled deposition. Akopyan's counsel provided defense counsel with dates for some, but not all, of the experts designated by Akopyan. In an October 2005 letter, counsel for Akopyan indicated that one of the designated damages experts, Kyle Boone, Ph.D., would be unavailable for deposition on the date selected. In further correspondence and discussions between the parties, counsel for Akopyan stated

4

they were considering withdrawing certain experts, including Dr. Boone. In a letter dated October 21, 2005, Akopyan's counsel offered a date for one deponent after the October 31 discovery deadline and failed to provide dates for two other deponents, including Dr. Boone, although counsel offered to provide dates " 'shortly.' " As of the date of the declaration in early November 2005, Akopyan's counsel had still not provided deposition dates for two deponents, including Dr. Boone.

After conducting a further status conference on November 4, 2005, the court issued a written ruling precluding Dr. Boone from testifying as an expert for Akopyan. The court further precluded Akopyan from designating other experts to testify as to the damages-related matters Dr. Boone was to address as an expert, including issues related to brain injury and Akopyan's psychological, cognitive, and emotional state, as well as his general psychological and social adaptation to his injuries. The court issued similar orders as to two experts designated by Akopyan on liability issues. The court's order permitted Akopyan to complete his depositions of the defendants' percipient and expert witnesses.

### First Trial (Mistrial)—March 2007

The first jury trial began on March 5, 2007. The court declared a mistrial two days later because there was no available court reporter as a result of a strike by county employees. The court set a new trial date of June 11, 2007, although it later continued the date to October 15, 2007.

According to Trailmobile, Akopyan did not serve any further discovery on defendants following the first mistrial. Akopyan does not dispute Trailmobile's contention.

### Akopyan's Motion to Designate Additional Experts

Following the mistrial, Akopyan moved to augment his expert witness designation to include three newly designated retained experts and four non-retained experts. Dr. Glaser and Dr. Boone were not among the experts Akopyan sought to include in the augmented expert witness disclosure. Akopyan relied upon the principle that a mistrial

restarts discovery and that the new trial date set by the court controls the cut-off for discovery and the exchange of expert witness information.

On May 18, 2007, the trial court issued an order granting in part and denying in part Akopyan's motion to augment his expert witness list. In ruling on the motion, the court noted that under the authority of *Fairmont Ins. Co. v. Superior Court* (2000) 22 Cal.4th 245 (*Fairmont*), "it is clear that discovery is reopened following, among other events, the declaration of a mistrial." The court characterized the directive in *Fairmont* as "clear and unequivocal." However, the court stated that *Fairmont* "did not consider the effect of any previous orders precluding evidence or imposing discovery limitations or sanctions." In *Fairmont,* the court permitted renewal of discovery under the circumstances of a remand, mistrial, or new trial because those circumstances were generally immune to abusive manipulation. The court contrasted the situation here: "To now permit discovery to resume unrestricted by prior orders made to sanction or prevent discovery abuse would be, at best, to ignore or, at worst, to reward prior, established discovery abuse. In balancing its obligation to follow the directive of the *Fairmont* court and its obligation to elimination [sic] discovery abuse, this court will continue to enforce all discovery abuse sanctions and orders previously made in this matter." The court set forth the history of the case in part, although it noted that "[i]t is not practically possible for the court to recite the history of discovery motions, abuses, orders and sanctions."

The court denied Akopyan's request to designate two new liability experts, reasoning that the subject of their testimony was identical or substantially similar to the testimony that was to be offered by the two liability experts the court previously ruled could not testify.[3] However, the court granted the motion to augment the expert witness

---

[3]In his opening brief on appeal, Akopyan states that the court denied his motion to augment his expert witness designation to include experts and categories that had been disallowed before the first trial, including Dr. Glaser and Dr. Boone. To be clear, Akopyan's motion did not request including Dr. Glaser and Dr. Boone as designated experts. The only reference to the pretrial exclusion orders was contained in a footnote in which Akopyan stated the rulings were clear error and had been superseded by the mistrial. Also, before filing his motion, Akopyan's counsel served a "post-mistrial"

6

list with five additional experts.[4]  In granting the motion in part, the court reasoned that the pretrial order requiring Akopyan to complete discovery according to a strict schedule was not a specific discovery sanction.  The court further reasoned that none of the court's prior orders precluded Akopyan from calling the five proposed experts or from eliciting the testimony they were prepared to offer.  The order notes that the court had previously issued an in limine order precluding certain witnesses from testifying at trial, but that "**[w]ith the reopening of discovery**" that order was moot and would be revisited at the pretrial conference.

In an order ruling on in limine motions dated September 24, 2007, the court observed that, following the mistrial, "[d]iscovery was reopened and all discovery response and cut-off dates [were] determined with reference to that new initial trial date." In a further order dated September 27, 2007, the court vacated the October 2007 trial date, reasoning that defense counsel had not been afforded sufficient opportunity to depose experts newly designated by Akopyan.  The court's order stated that "[**d]iscovery is closed**" with the exception of expert witness discovery related to three experts designated by Akopyan.

### Second Trial (Mistrial)—April 2008

A second jury trial commenced in April 2008.  After seven days of trial, the court declared a mistrial due to misconduct by Akopyan's counsel.  The court ruled that Akopyan's counsel had engaged in repeated violations of specific pretrial and in limine orders.

Following the second mistrial, the court rescheduled trial for January 26, 2009. Again, following the second mistrial, Akopyan did not serve further written discovery requests on defendants.

---

expert designation that listed 24 non-retained experts and 10 retained experts, although Dr. Glaser and Dr. Boone were not included in the list.

[4]In addition, the court later changed its ruling as to one of the liability experts it originally ruled could not testify.

7

### *Third Trial (Liability Issues)—January 2009*

The third jury trial in this case began in January 2009. The trial was limited to the issue of liability. At the conclusion of the liability phase, the jury returned a verdict finding that defendants were negligent and that their negligence was a significant factor in causing harm to Akopyan. The jury apportioned the fault for the accident between Akopyan and the defendants, with 18 percent attributable to Akopyan, 67 percent attributable to Bear, and 15 percent attributable to Trailmobile.

The trial court set the jury trial on damages for November 2, 2009. The damages trial was later continued to May 3, 2010.

### *Bear's June 2009 Motion to Reopen Discovery on Damages*

In June 2009, Bear filed a motion seeking a limited reopening of discovery on damages. Bear pointed out that it had not received any information concerning the extent of Akopyan's injuries and claimed damages since before the first mistrial. Bear had served supplemental discovery in 2006 but had not received a response. Further, Bear had sought updated discovery from Akopyan in 2009 but had not received a reply. Akopyan opposed the motion, contending that discovery was closed and that Bear was effectively seeking to reopen discovery in the middle of trial. In a July 2009 order, the court granted the motion for a limited reopening of discovery on damages issues.[5] Otherwise, discovery remained closed.

### *Fourth Trial (Damages Issues)—May 2010*

The jury trial on damages issues commenced in May 2010. Akopyan claimed the 2001 accident resulted in injuries to his neck, back, shoulders, and knees that necessitated several different types of conservative treatments that included home exercise programs,

---

[5]In his opening brief, Akopyan claims the court made clear at the hearing on Bear's motion for a limited reopening of discovery that it was not reopening discovery for Akopyan. The record does not contain a transcript of the hearing conducted on July 5, 2009, at which the trial court supposedly denied Akopyan's request to reopen discovery. Because there is no factual support for the assertions that Akopyan moved to reopen discovery or that the court denied any such motion, we shall disregard these assertions.

physical therapy, manipulations under anesthesia, and pain medication. It was Akopyan's position that it was ultimately necessary to perform surgery on his knees, back, neck, and shoulders because the conservative treatments failed. Akopyan also claimed the surgeries failed to alleviate his pain and that he would be dependent upon pain medication for the rest of his life, resulting in him being unable to hold any job for the remainder of his working life. Akopyan requested that the jury award him over $700,000 for past medical expenses and $2.6 to $3.5 million for future medical care.

The defendants' theory of the case was that Akopyan presented a pattern of exaggerating his injuries and was seeking damages for injuries and medical treatment unrelated to the 2001 accident. The defendants agreed that injuries to Akopyan's knees were attributable to the 2001 accident and that the subsequent treatments for his knees, including surgeries and some of the physical therapy, were reasonably necessary. They also agreed that emergency medical treatment provided at the scene and the hospital immediately after the crash was reasonably necessary. They likewise agreed that Akopyan's consultation with a neurologist concerning headaches following the accident, including the MRI's of the brain, was reasonable to assess his neurological condition. With regard to issues related to Akopyan's back, the defendants agreed that an MRI of the lower back was reasonable for purposes of assessing if he had an injury attributable to the 2001 accident. In total, the defendants agreed that Akopyan should be awarded $54,762 for past medical expenses he incurred as a result of the 2001 accident. Bear and Trailmobile contested all of Akopyan's other claimed injuries and denied that any other past medical treatment was reasonably necessary for injuries suffered in the 2001 accident. The primary disputed issues at trial were whether Akopyan's claimed injuries to his neck and back were attributable to the 2001 accident, and whether the medical treatment he received was excessive or reasonably necessary.

### *Evidence Offered by Akopyan*

On the day of the accident in 2001, Akopyan received emergency medical treatment at the scene and at the hospital. He reported neck and thigh pain, had abrasions to his right elbow and knee, and had a superficial cut on his forehead that required

9

stitches.  While being treated at the hospital, Akopyan told the attending physician that he was not experiencing any back pain.  A CT scan of his neck revealed no fractures or dislocation but showed degenerative changes, including bony overgrowth and disc bulge narrowing.  Akopyan was considered to be in "good condition" and was released the same day, walking out of the hospital unassisted with a prescription for Tylenol with Codeine.

A little over two weeks after the accident, Akopyan was treated by Dr. Robere Missirian, an orthopedic surgeon.  Akopyan reported headaches and pain in his neck, back, chest, hip, wrists, and knee.  Dr. Missirian's examination revealed a cut on Akopyan's forehead, pain and tenderness in his cervical spine and the back of his right shoulder, tenderness in his lower back, and a hematoma near his right hip.  His right knee was swollen, unstable, and had a significantly diminished range of motion.  Akopyan told Dr. Missirian that these injuries occurred in the 2001 accident.  Dr. Missirian did not observe any neurological defects in Akopyan's neck or back.

Dr. Missirian ordered an MRI of Akopyan's right knee, lower back, and wrists. The lower back MRI revealed bulging discs and pre-existing mild arthritic changes but no neurological defects associated with the bulges.  The MRI of Akopyan's right knee revealed a torn meniscus.  After Akopyan's knee was more stable, Dr. Missirian performed arthroscopic surgery on the right knee.  Several months later, Akopyan tore the meniscus in his left knee as a result of compensating for the injury to his right knee. Dr. Missirian subsequently performed arthroscopic surgery on Akopyan's left knee.

Akopyan continued to report pain in his back that was treated with chiropractic care, as well as epidural injections and manipulations under anesthesia.  According to Dr. Missirian, Akopyan's back continued to deteriorate instead of healing over time as most injuries would.  Akopyan underwent his first back surgery in 2004, followed by later surgeries to different areas of his back.  Throughout the course of the surgeries and other treatments, Akopyan continued to report pain and claimed the condition of his back worsened over time.

Dr. Missirian and Dr. Ayman Salem, who performed back surgeries on Akopyan, both testified it was their opinion that all of Akopyan's injuries were caused by the 2001 accident. They reached this conclusion because they knew of no other cause of Akopyan's condition in view of his claim that he had no prior injuries to the affected parts of his body. Akopyan had told Dr. Missirian and Dr. Salem that he had no medical problems in the past and denied any significant prior injuries or accidents. This medical history was important to both Dr. Missirian's and Dr. Salem's opinions on causation and treatment.

Akopyan offered testimony from three physicians to support his claim that the 2001 accident caused him to develop a chronic pain condition. Dr. Mohamed Kattih, a specialist in chronic pain and rehabilitation, testified that Akopyan developed a chronic pain condition as a result of the accident and opined that Akopyan will be in pain and dependent upon painkillers for the rest of his life. Dr. Kattih did not believe that Akopyan was malingering or being untruthful about his pain.

Dr. Lawrence Miller, a physician specializing in physical medicine and rehabilitation, diagnosed Akopyan with an untreatable chronic pain condition that would not improve with surgery, therapy, or pain medication. Dr. Miller testified that Akopyan would never be employable. Dr. Miller further explained that Akopyan's exaggeration of his symptoms was not malingering but simply an effort to convince his doctors that he was in pain. In his explanation, Dr. Miller criticized the use of certain neurological testing—referred to as the "fake bad scales"—in assessing whether a patient was malingering. He further testified that Akopyan had a conversion disorder that explained why Akopyan believed he had such severe injuries despite not actually experiencing serious injuries in the accident. He recommended a life care plan that included a two-week inpatient program designed to reduce Akopyan's dependence on pain medication followed by outpatient programs designed to address pain management. The cost for the inpatient program was estimated to be $59,730.

Dr. Arthur Joseph Glaser, a clinical psychologist, testified that Akopyan suffered from post-traumatic stress disorder. Like Dr. Miller, Dr. Glaser diagnosed Akopyan with

11

a chronic pain disorder.  Also like Dr. Miller, Dr. Glaser criticized the use of "fake bad" testing to evaluate whether Akopyan was malingering.

## *Evidence Offered by Defendants*

Bear and Trailmobile presented testimony from three physician experts that examined Akopyan.  Dr. Bruce Albert, an orthopedic surgeon, examined Akopyan in April 2003 and offered an opinion regarding the injuries attributable to the 2001 accident and the recommended treatment for those injuries.  Dr. Albert's examination suggested that Akopyan's disc bulge was not symptomatic.  Based upon his review of Akopyan's medical records and his examination of Akopyan, Dr. Albert testified that the initial medical treatment received at the hospital, as well as the follow up evaluation with Dr. Missirian, including the MRI's and the knee surgeries, were reasonable.  He also testified that 30 sessions of physical therapy were reasonable following the knee surgeries and that Akopyan's knees should have healed within six weeks of the surgeries without further pain.

Dr. Daniel Rovner, a neurologist, examined Akopyan's neurological functioning to determine what injuries were attributable to the 2001 accident.  Dr. Rovner observed that Akopyan offered an incomplete history of his physical complaints, had a gait that was inconsistent with a neuromuscular disease process, and was not making an effort on the mental status exam.  Dr. Rovner testified that Akopyan's trivial head trauma and muscle and ligament strain caused by the 2001 accident should have resolved with conservative treatment.

Dr. Robert Tomaszewski, a clinical neuropsychologist, also evaluated Akopyan. His evaluation led him to conclude that Akopyan's test results were not a valid representation of his functioning ability and were not consistent with any known patterns of cognitive dysfunction.  For instance, Akopyan's test results would suggest he was incapable of driving a car, yet Akopyan was observed driving to the examination. Akopyan failed the "fake bad scale" symptom validity tests in the mental examination. This result led Dr. Tomaszewski to the conclusion that Akopyan was probably malingering and over-reporting his physical symptoms.  Dr. Tomaszewski testified that

12

the test results were more consistent with inadequate effort and malingering—i.e., intentional acts by the patient—rather than a somatoform disorder that is unintentional.

### *Evidence Bearing Upon Akopyan's Credibility*

Akopyan testified at trial that he had not been injured in a car accident before the April 2001 accident, and he denied seeking chiropractic treatment for his neck or back as a result of any prior accident. Further, in response to an interrogatory, Akopyan had denied seeking compensation for personal injuries suffered in the 10-year period preceding the 2001 accident. Defense counsel impeached Akopyan with evidence that he had been in an accident in November 2000, that he and his mother had a lawyer at the time who made a demand for compensation to an insurance company, and that he was treated by a chiropractor for injuries suffered. A report prepared by chiropractor Jouleta Grigorian established that Akopyan had been in a car accident in late 2000, that he claimed to have suffered back and neck injuries as a result, and that he sought chiropractic treatment for those injuries. Five months before the April 2001 accident, Akopyan's treating chiropractor reported that his condition remained "guarded." In the face of this evidence, Akopyan maintained that he had no recollection of the accident, any injuries he might have suffered, or any treatment he may have received.

Akopyan also denied being in a car accident after 2002, and specifically denied being in a car accident in 2009. Akopyan recanted this testimony when he was impeached with evidence of a police report containing his signature and establishing he had been in an accident in 2009.

Photographs that showed Akopyan camping and engaging in other activities were introduced for the purpose of demonstrating that he enjoyed certain activities that he was purportedly unable to do after the 2001 accident. Akopyan testified that a number of photos were taken of him before the 2001 accident. He also testified that he was first married in 2004, a fact that became relevant because he was wearing a wedding ring in some of the photos. Consequently, the jury was able to infer that the pictures purportedly showing him engaged in activities before the 2001 accident were, in fact, taken well after the accident. In addition, Akopyan's brother testified that one trial exhibit consisting of a

13

camping photo was probably taken after the accident, despite Akopyan's testimony that he believed it had been taken before the accident.

Akopyan claimed that he could not drive, lift items, or perform other activities associated with everyday life. In a similar vein, one of Akopyan's expert witnesses testified that Akopyan was unable to drive as of 2005 and required the use of a cane. However, at trial the defense introduced surveillance video taken in 2006 showing Akopyan walking without a cane as well as driving. Additional surveillance video from 2009 showed Akopyan carrying his child, loading the child into his car, and driving to a doctor's appointment.

### *The Verdict*

The jury returned a unanimous verdict awarding Akopyan a total of $845,938. He received $251,832 for past lost earnings, $54,762 for past medical expenses, $59,730 for future medical expenses, $181,614 for future lost wages and vocational rehabilitation, $48,000 for property damage, and $250,000 for past pain and suffering. The jury did not award any damages for future pain and suffering.

Akopyan filed a timely notice of appeal from the judgment.

### DISCUSSION

**1.** *2005 Scheduling Order and Evidentiary Sanctions*

In response to a motion to dismiss for lack of prosecution, the trial court issued an order in July 2005 denying the motion to dismiss and instead setting a schedule for completion of discovery. Among other things, the court's order directed the parties to complete all of the depositions of Akopyan's witnesses by October 31, 2005. After Akopyan failed to produce certain experts for deposition, the court issued orders in September and November 2005 precluding the experts from testifying at trial and also preventing Akopyan from designating other experts to testify as to the issues the precluded experts were slated to address.

Akopyan objects to the July 2005 scheduling order as well as the evidentiary sanctions that resulted from the application of that order. Akopyan seizes on a reference the trial court made at a hearing in July 2005 in which it stated it was going to supersede

14

the portion of the Code of Civil Procedure dealing with expert witness disclosure and discovery because "it's not getting done." Based primarily upon that isolated statement, Akopyan contends the trial court improperly superseded the Code of Civil Procedure, terminated his right to discovery, and excluded experts who failed to appear for deposition on dates unilaterally selected by defendants. As we explain, the court acted within its discretion.

The trial court's 2005 scheduling order resulted from a discretionary motion to dismiss for lack of prosecution. A court's ruling on such a motion is reviewed for abuse of discretion. (*Roman v. Usary Tire & Service Center* (1994) 29 Cal.App.4th 1422, 1430.) Section 583.150 provides that the statutes allowing for dismissal as a result of a delay in prosecution do not limit or affect the court's authority to impose other sanctions under the court's inherent powers or pursuant to other statutory schemes.

It is well settled that courts have fundamental, inherent powers to control litigation before them. (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377.) "Courts are not powerless to formulate rules of procedure where justice demands it." (*Adamson v. Superior Court* (1980) 113 Cal.App.3d 505, 509.)

"Misuse of the discovery process may result in the imposition of a variety of sanctions. These include payment of costs, sanctions barring the introduction of certain evidence, sanctions deeming that certain issues are determined against the offending party, and sanctions terminating an action in favor of the aggrieved party. [Citations.] Misuse of the discovery process includes . . . disobeying a court order to provide discovery . . . and failing to meet and confer in good faith to resolve a discovery dispute when required by statute to do so." (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1214.) Under section 2025.450, the court has the power to impose an issue sanction, an evidentiary sanction, or terminating sanctions for failure to obey a court order compelling attendance at a deposition. In addition, section 2034.300, subdivision (d) allows a court to exclude the expert opinion of an expert who is not made available for deposition.

"[V]iolation of a discovery order is not a prerequisite to issue and evidentiary sanctions when the offending party has engaged in a pattern of willful discovery abuse . . . ." (*Karlsson v. Ford Motor Co., supra,* 140 Cal.App.4th at p. 1215.) As a general matter, the purpose of discovery sanctions is to prevent abuse of the discovery process and correct the problem rather than serve as a punishment. (*Pratt v. Union Pacific Railroad Co.* (2008) 168 Cal.App.4th 165, 183.) An order imposing discovery sanctions "will not be reversed on appeal in the absence of a manifest abuse of discretion that exceeds the bounds of reason, resolving all evidentiary conflicts in favor of [the trial court's] ruling." (*Ibid.*)

In this case, the trial court employed an incremental approach to addressing the parties' discovery dispute. At the outset, in December 2003, the court vacated the trial date and ordered the parties to meet and confer regarding a deposition schedule. Over a year later, in April 2005, Bear moved to dismiss for failure to prosecute, noting that Akopyan had failed to meet and confer as required by the court's order. In ruling on the motion in July 2005, the court noted it was very close to dismissing the action and had no confidence in the parties' ability to meet and confer. Instead of dismissing the case, the court chose to impose a scheduling order that required Akopyan to comply with a deposition schedule set by defendants. The court warned Akopyan that the case would be dismissed if he failed to comply. It was only after Akopyan failed to comply with the scheduling order that the court imposed evidentiary and issue sanctions. This sequence of events does not suggest arbitrary or capricious action by the trial court, but instead is evidence of a reasonable and measured effort to balance Akopyan's right to a trial on the merits with the defendants' right to discovery and to proceed to trial without undue delay.

Akopyan complains that the scheduling order required him to comply with a deposition schedule unilaterally set by the defendants. We disagree with Akopyan's characterization of the order. While it is true that the court's order directed the defendants to set the deposition schedule at the outset, the apparent purpose of that directive was to avoid miring the litigation in further, lengthy, and unsuccessful attempts to meet and confer concerning a mutually acceptable deposition schedule. Nothing

16

prevented Akopyan from objecting to a deposition notice or proposing alternative dates for a particular deposition. However, instead of objecting to the notice or proposing alternative dates, Akopyan's counsel and the first expert scheduled for deposition, Dr. Glaser, simply failed to appear on the scheduled date. Akopyan contends he offered alternative dates for the deposition, but that was only *after* his expert failed to appear and Bear moved to dismiss the action. Bearing in mind that Akopyan's counsel told the trial court he intended to abide by the court's scheduling order at the time it was issued, and in view of the court's admonition that the action would be dismissed for failure to produce witnesses noticed for deposition, Akopyan's counsel offered no valid justification for his failure to comply with the order.

Further, after Akopyan's unexplained failure to produce Dr. Glaser for deposition, the parties sought to agree on mutually acceptable dates for the remaining depositions, belying Akopyan's contention that the defendants sought to unilaterally and inflexibly dictate the deposition schedule. Akopyan's failure to produce Dr. Boone was not the result of an inconvenient deposition date unilaterally selected by defendants. Rather, Dr. Boone was not deposed because Akopyan's counsel failed to provide the defendants with available deposition dates for Dr. Boone.

Akopyan claims the court's scheduling order is invalid because it supersedes the Code of Civil Procedure. In support of his argument, Akopyan places heavy reliance on *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285 (*Hernandez*). The case is inapposite. In *Hernandez*, the court directed the plaintiffs to unilaterally disclose their experts and expert opinions to the defendants, ostensibly to provide the parties with enough information to determine if summary judgment motions were warranted. (*Id.* at p. 296.) The trial court acknowledged that a simultaneous exchange of experts was required by statute but found that a nonsimultaneous exchange would facilitate resolution by summary judgment. (*Ibid.*) The Court of Appeal reversed the trial court's order, reasoning that the relevant statute "provides for an earlier simultaneous, mutual exchange, but it does not permit a unilateral exchange." (*Id.* at p. 297.) While noting that courts possess inherent power to adopt suitable procedures, the *Hernandez* court

17

explained that courts do not have power to adopt procedures directly in conflict with a statute. (*Id.* at pp. 296–297.)

Here, the parties simultaneously exchanged expert disclosures in November 2003. Unlike in *Hernandez,* the trial court did not order Akopyan to unilaterally disclose the identity of his experts. Instead, the court simply directed the order in which expert depositions were to take place in light of longstanding and intractable difficulties in scheduling and completing expert discovery. Nothing in *Hernandez* precludes a court from ordering one party's expert depositions to proceed first. Nor has Akopyan explained how such a scheduling order violates any specific directive contained in the Code of Civil Procedure. At most, he claims the Code of Civil Procedure "envisions" that parties will complete all of their percipient witness discovery before expert witness discovery is conducted, and he complains the court set an arbitrary deadline for completing discovery of his expert witnesses. Despite his claim that the court's scheduling order somehow violates the spirit of the Code of Civil Procedure, he has failed to specify the statute that was purportedly violated by the court's order or explain how the court exceeded its inherent authority to control the proceedings before it.

Further, it bears mention that Akopyan does not claim to have suffered any particular prejudice as a result of having to present his expert witnesses for deposition first before conducting depositions of the defense experts. His primary complaint is that the court issued exclusionary orders precluding Dr. Glaser and Dr. Boone from testifying at trial. However, the exclusionary orders have little to do with whose experts were deposed first. The orders were the product of misconduct by Akopyan's counsel and his failure to make the witnesses available for deposition.

We conclude the court acted within its discretion in issuing the 2005 scheduling order and in imposing evidentiary sanctions after Akopyan violated the court's order. Although the court was inclined to dismiss the case in 2005, it chose instead to control discovery and keep a tighter rein on Akopyan's counsel in light of the extreme delay in completing expert discovery. The evidentiary sanctions were an appropriate response to Akopyan's repeated violations of the court's orders and were directly tailored to remedy

18

the harm caused by the actions of Akopyan's counsel. The evidentiary sanctions permitted Akopyan to proceed with his case on the merits with all but two of his many designated experts. The sanctions also ensured that the defendants would not be surprised or unprepared at trial with evidence that they or their experts had not been permitted to explore in discovery.

**2.** *Purported Failure to Reopen Discovery After Mistrials*

Akopyan next contends the trial court erred in preventing him from conducting discovery after the court declared a mistrial on two occasions. As a consequence, he claims he was unfairly surprised at trial by the existence of surveillance video as well as a chiropractic report predating the 2001 accident. He also argues that he should have been allowed to augment his expert witness list following the mistrials to designate experts who had previously been precluded from testifying as a result of evidentiary sanctions issued in 2005. As set forth below, we reject Akopyan's contentions.

**a.** *Governing Law*

In *Fairmont, supra,* 22 Cal.4th at p. 247, our Supreme Court held that discovery reopens following a mistrial, an order granting a new trial, or a remand for a new trial after a judgment is reversed on appeal. In such a case, the new discovery cutoff is calculated from the date initially set for the new trial. (*Ibid.*) The court reasoned that requiring parties to seek leave to take additional discovery in the case of a new trial would not be consistent with the purposes of the Discovery Act. (*Id.* at pp. 252–253.)

The reopening of discovery extends to the designation of experts. (See *Guzman v. Superior Court* (1993) 19 Cal.App.4th 705, 706.) In *Beverly Hospital v. Superior Court* (1993) 19 Cal.App.4th 1289, 1291, the court held that a mistrial restarts the time limitations on discovery and permits the parties to file new demands for the exchange of expert witness information. Likewise, in *Hirano v. Hirano* (2007) 158 Cal.App.4th 1, 9, the court held that "[t]he rule that discovery is automatically reopened following reversal on appeal is particularly applicable to expert witness discovery." The court explained that parties may be forced to change expert witnesses due to a prior witness's unavailability or to respond to additional evidence raised in the new trial. (*Ibid.*)

19

**b.** *Reopening of Discovery After Mistrials*

Akopyan asserts that the court ignored *Fairmont* and refused to reopen discovery following the two mistrials. He argues that he was unfairly surprised at trial by surveillance video and a chiropractic report because he was denied the opportunity to conduct further discovery. Akopyan's contention is wrong as a factual matter.

The trial court recited the following history in an order denying Akopyan's new trial motion: "Discovery reopened for several periods following the initial surveillance [of Akopyan] in 2006. Although the court erroneously closed discovery following the March 2007 mistrial, that error was corrected in orders issued [May] 18 and June 14, 200[7]. Discovery was reopened from March 18 to the thirtieth day preceding the initial trial date (October 15, 2007) following the March mistrial (CCP 2024.020(a))[.] Discovery reopened for a second time after the April 2008 mistrial."

Our review of the record confirms the trial court's recitation of the relevant procedural history. In its ruling on Akopyan's motion to augment his expert witness list after the first mistrial, the trial court specifically acknowledged that discovery reopens following the declaration of a mistrial. Indeed, in its June 2007 order, the court noted that, "[**w**]**ith the reopening of discovery**" it would revisit its earlier orders precluding certain witnesses from testifying at trial. Further, the court allowed Akopyan to designate five new experts and later permitted Akopyan to add additional experts. The court would not have permitted Akopyan to designate new experts unless it concluded that discovery had been reopened.

Akopyan focuses on the court's ruling that it would "continue to enforce all discovery abuse sanctions and orders previously made in this matter." He seems to interpret this ruling to mean that the court intended to enforce all orders previously issued, including orders closing discovery. That is an erroneous reading of the order. The plain import of the court's order is that the court intended to enforce all orders and sanctions *arising out of discovery abuses*. Consequently, the court made clear that it would not permit Akopyan to designate experts to testify as to the issues slated to be addressed by experts precluded from testifying as a result of prior evidentiary sanctions.

20

The court otherwise acknowledged that discovery had reopened and indicated so in its order. Akopyan points out that the court stated in a September 2007 order that discovery was closed with the exception of certain expert discovery, but that order simply reflects that discovery closed again before the October 2007 trial date following the first mistrial. The order does not suggest that discovery had remained closed following the first mistrial. Indeed, in an in limine order issued just days earlier, the court stated that, following the first mistrial, "[d]iscovery was reopened and all discovery response and cut-off dates [were] determined with reference to that new initial trial date."

According to Akopyan, the court's limited reopening of discovery at Bear's request in July 2009 confirmed that discovery remained closed before that date. Discovery was closed at the time, but not because the trial court refused to give effect to the holding in *Fairmont.* Discovery was reopened after the second mistrial in 2008 but closed again before the January 2009 trial on liability issues. At the time Bear sought a limited reopening of discovery in June 2009, the parties were in the middle of a bifurcated trial with damages issues yet to be tried. We are aware of no authority suggesting that discovery automatically reopens following the first phase of a bifurcated trial. Consequently, the fact that Bear sought to reopen discovery on a limited basis between the phases of a bifurcated trial has no bearing upon whether discovery was automatically reopened during the periods following the mistrials in 2007 and 2008.

Akopyan had the right to pursue further discovery following the mistrials in 2007 and 2008. He simply chose not to do so. Also, like Bear, he could have sought to reopen discovery following the liability phase of trial in 2009. Again, there is nothing in the record to suggest he sought such relief. In his opening brief on appeal, he claims the court made clear at a hearing in July 2009 that it would not allow him to reopen discovery. Because the transcript of that hearing was not provided to this court, the record contains no support for Akopyan's assertion.[6]

---

[6]In his reply brief, Akopyan conceded that the hearing transcript is not part of the record on appeal but claimed that he would order "a copy of the July 5, 2011 [sic]

21

Consequently, Akopyan's lack of diligence in pursuing discovery precludes any argument that he was unfairly surprised at trial by surveillance video and a chiropractor's report.

### c.      *Effect of Mistrials on Evidentiary Sanctions*

Throughout the duration of the case below, the trial court maintained in place the evidentiary sanctions issued in September and November 2005. As a consequence, Akopyan was precluded from calling Dr. Glaser and Dr. Boone as expert witnesses at trial, and he was further precluded from replacing them with other experts in their designated fields.

Akopyan contends that he had an "absolute right" to designate new experts following each mistrial under the authority of *Fairmont* and cases specifically addressing the automatic reopening of expert discovery. He further argues that the evidentiary sanction orders were rendered irrelevant and that the court's continued enforcement of the orders amounted to punishment instead of a legitimate effort to remedy discovery abuse. The issue presented is whether the reopening of discovery following a mistrial automatically erases the effect of evidentiary sanctions issued before a mistrial.

The authority relied upon by Akopyan does not support a conclusion that evidentiary or other sanctions issued for discovery abuses have no further effect following the declaration of a mistrial. The purpose of the rule automatically reopening discovery in the case of a new trial is to promote the purposes of the Discovery Act— "i.e., promoting discovery by permitting parties to fully inform themselves of the facts, expediting efficient trial preparation, and reducing time-consuming and costly litigation over discovery disputes." (*Fairmont, supra,* 22 Cal.4th at pp. 252–253.) "In the typical case, when a new trial is required, the nature and scope of the issues will have been affected, requiring substantial investigation of new points or issues that were not adequately addressed in the original proceedings." (*Id.* at p. 253.) Thus, reopening

---

Transcript of Proceedings" and seek to augment the record on appeal with the transcript. No such transcript has been provided to this court.

22

discovery allows the parties to receive updated information and eliminate gaps in the evidence that may have prompted the need for a new trial in the first place. (*Ibid.*)

The justification for reopening discovery in the case of a new trial does not support erasing evidentiary sanctions for past discovery abuses. A party may have a legitimate need to get updated or new information following a mistrial, but that party should not be able to pursue discovery previously denied by the court simply because a new trial was ordered. The effect of a mistrial or order granting a new trial is to place the parties in the *same* position as if the case had never been tried. (See *Saakyan v. Modern Auto, Inc.* (2002) 103 Cal.App.4th 383, 390.) A rule that evidentiary sanctions are automatically expunged following a mistrial or order granting a new trial would place a sanctioned party in a *better* position than the party was in before the case was tried.

In *Fairmont,* the Supreme Court explained that the reopening of discovery in the case of a new trial does not allow the parties to start with a fresh slate unencumbered by the past history of discovery in the case. (*Fairmont, supra,* 22 Cal.4th at p. 254.) Specifically, the court stated that limits on deposing natural persons only once apply "during the run of the litigation," and it confirmed that numerical limits continue to apply to the number of interrogatories and requests for admission served on parties. (*Ibid.*) Thus, the court recognized that discovery is not unlimited after a new trial is ordered but is instead seen as a continuation of discovery previously conducted in the case.

As relevant here, the *Fairmont* court stated that it could discern no reason not to reopen discovery after a new trial is ordered "*[i]n the absence of any abuse of the discovery procedures.*" (*Fairmont, supra,* 22 Cal.4th at p. 255, italics added.) The court's qualification acknowledges that the automatic reopening of discovery in the case of a new trial does not excuse past discovery abuses or permit the parties to abuse the process once discovery is reopened. Further, in adopting the rule that discovery is reopened in the event of a new trial, the court dismissed the concern that a party would generate grounds for a mistrial or new trial "merely in order to extend the time for discovery." (*Id.* at p. 252.) The concern about creating grounds for a mistrial is much greater in the case of a party that is the subject of evidentiary sanctions. Unlike a party

23

who may simply want additional time to conduct discovery—a motivation the *Fairmont* court deemed too trivial to motivate a party to create grounds for a new trial—a party subject to evidentiary sanctions would have sufficient motivation to generate a mistrial if that party believed the mistrial would have the effect of erasing the sanctions.

We agree with the trial court's conclusion that the reopening of discovery following a mistrial or other order granting a new trial does not permit discovery to resume unrestricted by previous orders made to sanction or prevent discovery abuse. A rule establishing that a mistrial allows a party to conduct discovery unfettered by past discovery and evidentiary sanctions would reward discovery abuse and encourage parties to generate grounds for mistrials or new trials simply in order to avoid the effect of the sanctions.

### 3. *Admission of Chiropractor's Report*

At trial, Akopyan denied being in a motor vehicle accident in November 2000. Bear's counsel showed Akopyan a demand letter prepared by an attorney as well as a chiropractor's report indicating that Akopyan had been in a motor vehicle accident in November 2000 and had received chiropractic treatment for his injuries. Akopyan still claimed he had no recollection of the earlier accident. After Bear's counsel sought to move the chiropractic report into evidence as a prior inconsistent statement or a party admission, Akopyan's counsel objected to the report as inadmissible hearsay. The court ultimately admitted the report into evidence under the business records exception to the hearsay rule after receiving a declaration from the treating chiropractor. (Evid. Code, § 1271.)

Akopyan contends on appeal that the trial court erred in admitting the chiropractor's report into evidence because a sufficient foundation had not been laid to establish that the report fell under the business records exception to the hearsay rule. He argues that an insurance company representative who was called to testify concerning the documents shown to Akopyan was not competent to testify as to their mode of preparation.

The argument rests upon an inaccurate presentation of the record. The court specifically rejected the claim that an insurance company representative's declaration was sufficient to establish a foundation for admitting the report as a business record. Instead, the court admitted the report into evidence based upon a declaration by the treating chiropractor. The chiropractor, Jouleta Grigorian, stated in her declaration that she prepared the report in the regular course of her business. She further stated that the report was prepared at or near the time of the events recorded in the document. She identified her signature on the report as well as that of another treating chiropractor, and she confirmed that the report detailed the examinations and treatment of Akopyan.

The declaration submitted by the chiropractor was sufficient to establish the report as a business record admissible under Evidence Code section 1271. (Cf. *Cooley v. Superior Court* (2006) 140 Cal.App.4th 1039, 1045 [nonparty business record may be admitted through declaration instead of live testimony]; see also Evid. Code, § 1561, subds. (a)(1)–(a)(5).) In any event, the chiropractor testified at trial after Akopyan's counsel subpoenaed her. Her testimony confirmed that a sufficient foundation existed for admitting the chiropractic report as a business record under Evidence Code section 1271.

4.    *Failure to Instruct with CACI No. 3929*

Akopyan contends the court erred in refusing to instruct the jury with CACI No. 3929, which generally provides that a defendant who is legally responsible for a plaintiff's injuries is also responsible for any additional harm caused by others that negligently treat the injuries.[7] According to Akopyan, because defendants based their defense largely on the argument that certain treatments and therapies were excessive and unnecessary, he was entitled to have the jury instructed that the defendants may be liable for those costs as an additional harm caused by the negligent acts of his treating physicians. Akopyan's contention lacks merit.

---

[7]CACI No. 3929 reads: "If you decide that [name of defendant] is legally responsible for [name of plaintiff]'s harm, [he/she/it] is also responsible for any additional harm resulting from the acts of others, in providing medical treatment or other aid that [name of plaintiff]'s injury reasonably required, even if those acts were negligently performed."

25

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case *advanced by him* which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572, italics added.)  CACI No. 3929 may appropriately be given when there is evidence that a further injury resulted from negligently performed subsequent medical treatment or from a risk inherent in the necessary medical care.  (See *Henry v. Superior Court* (2008) 160 Cal.App.4th 440, 452, fn. 6.)  The important factor in determining whether subsequent negligent medical treatment is attributable to the defendant is " 'that the medical treatment is closely and reasonably associated with the immediate consequences of the defendant's act and forms a normal part of its aftermath.' " (*Id.* at pp. 451–452.)

In this case, Akopyan did not claim at trial that his doctors provided incorrect or inadequate medical treatment.  To the contrary, he argued that all of the treatment he received was necessary and proper.  Even now, he does not suggest that his treating physicians committed malpractice or provided negligent medical care.  He cites no evidence, much less substantial evidence, that the doctors provided negligent medical care.

By its terms, CACI No. 3929 only applies to negligently rendered aid that is "reasonably required" to treat injuries caused by a defendant's conduct.  Here, the defendants argued that many of the treatments Akopyan received were not reasonably required or were unrelated to injuries attributable to the 2001 accident.  They did not argue that any medical provider was negligent in providing medical care reasonably required to treat injuries suffered in the 2001 accident.

Because Akopyan did not advance the theory that he was harmed by the negligent conduct of his own doctors, and because there was no substantial evidence to support that theory, the court did not err in refusing to instruct the jury with CACI No. 3929.

5.     *Failure to Award Damages for Future Pain and Suffering*

In its special verdict, the jury found that Akopyan will be reasonably certain to need medical care in the future as a result of injuries suffered in the 2001 accident.  It awarded damages for future medical expenses of $59,730 and noted parenthetically that

this amount was for a "pain management program." And, although the jury awarded damages of $250,000 for past physical pain and suffering, it awarded no damages for future pain and suffering. Akopyan claims the verdict is inconsistent and void as a matter of law because the jury failed to provide any measure of damages for future pain and suffering despite concluding that he will be reasonably certain to need medical care in the future as a result of the 2001 accident.

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve the inconsistency." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357–358.) "On appeal, we review a special verdict de novo to determine whether its findings are inconsistent." (*Id.* at p. 358.) We will not reverse unless a verdict is "hopelessly ambiguous." (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 457.)

Here, Akopyan waived any claim to challenge the supposedly inconsistent verdict by failing to request clarification before the jury was excused. " 'It is well established by numerous authorities that when a verdict is not in proper form and the jury is not required to clarify it, any error in said verdict is waived by the party relying thereon who at the time of its rendition failed to make any request that its informality or uncertainty be corrected.' " (*Bisnett v. Hollis* (1962) 207 Cal.App.2d 142, 150.)

Even if Akopyan had properly preserved the issue for appeal, we do not agree that the special verdict is necessarily inconsistent. At the time the jury reached its verdict, nine years had passed since the 2001 accident. The jury awarded $250,000 for past pain and suffering. The jury heard evidence that Akopyan's injuries should have resolved following his knee surgeries and that he should not have developed a chronic pain condition as a result of arthroscopic knee surgeries. As the trial court noted in ruling on a

27

motion for new trial, the jury's award for past medical expenses supported an inference that the jury rejected Akopyan's claims that his back and neck injuries were attributable to the 2001 accident. This inference is supported by the fact that the jury awarded past medical expenses in the precise amount suggested by defendants, an amount that was generally limited to the expense of the initial medical treatment in the emergency room, the costs associated with treating and surgically repairing Akopyan's knees, and the costs incurred to perform necessary diagnostic tests. The amount of damages awarded for future medical expenses—$59,730—corresponds exactly to the amount that Akopyan's expert, Dr. Miller, estimated would be required for a two-week program designed to reduce Akopyan's dependence on pain medication. Indeed, the jury specifically noted the amount was for a "pain management program." Consequently, a reasonable reading of the special verdict is that the only medical care required in the future related to Akopyan's addiction to pain medication. The special verdict also supports the inference that the jury believed Akopyan had endured pain and suffering in the past as a result of the injuries to his knees but that those injuries required no further medical treatment, aside from therapy to resolve Akopyan's addiction to pain medication. As noted, the jury impliedly rejected Akopyan's claims that his back and neck injuries were attributable to the 2001 accident, thereby ruling out the possibility that he should be awarded pain and suffering damages associated with those injuries. Under the circumstances, it was not inconsistent for the jury to award nothing to Akopyan for future pain and suffering despite its conclusion that he would require a drug rehabilitation program in the future. The jury could have reasonably concluded that Akopyan would not endure pain and suffering in the future attributable to the 2001 accident, or it could have reasonably concluded that the pain management program would fully resolve any such pain and suffering.

Further, insofar as Akopyan contends the damage award is insufficient as a matter of law, we disagree. We will generally not disturb a jury's award of damages as compensation for personal injuries unless an abuse of discretion appears, or unless the award is inadequate based upon a fair consideration of the evidence. (*Haskins v. Holmes*

28

(1967) 252 Cal.App.2d 580, 584.) There is no guarantee that an injured plaintiff is entitled to general damages for pain and suffering. (Cf. *Miller v. San Diego Gas & Elec. Co.* (1963) 212 Cal.App.2d 555, 558.) A verdict limited to the amount of medical expenses incurred or for a lesser amount is not necessarily inadequate as a matter of law. (*Ibid.*) In *Miller,* the court found that an award in the amount of medical bills alone was not inadequate because there was a substantial conflict in the evidence presented to the jury as to whether the plaintiff received any substantial injury and whether the medical bills were necessary as a result of that injury. (*Id.* at pp. 560–561.) Likewise, in this case there was conflicting evidence as to whether Akopyan suffered substantial injury or pain as a result of the 2001 accident. In view of the conflict in the evidence, the jury was entitled to award Akopyan the cost of his future medical care but decline to award general damages for future pain and suffering.

Akopyan's reliance on *Bisnett v. Hollis, supra,* 207 Cal.App.2d 142 is unavailing. There, the jury found the defendants liable for negligence but awarded no damages to the plaintiff. (*Id.* at p. 144.) The Court of Appeal reversed, noting that there was no real attack on the plaintiff's evidence that she was injured. (*Id.* at p. 147.) Although the court reasoned that the jury might have questioned whether the entire amount of plaintiff's medical treatment was necessary, the jury could not reasonably award nothing. (*Id.* at p. 148.) Here, by contrast, the jury did not award nothing. It awarded special damages for past and future medical costs and general damages for past pain and suffering. It simply declined to award damages for future pain and suffering, a result that does not compel a conclusion the damages were inadequate as a matter of law. (See *Miller v. San Diego Gas & Elec. Co., supra,* 212 Cal.App.2d at p. 558.)

It was entirely within the purview of the jury to adopt Akopyan's position, the defendants' position, or to find some middle ground. The verdict establishes that the jury found middle ground by awarding special damages to undergo pain management treatment and declining to award general damages for future pain and suffering. The verdict is not inconsistent and the damages are not insufficient as a matter of law.

29

## 6. *Purported Misconduct During Closing Argument*

In closing argument, Bear's counsel argued to the jury that it had "the power to send a message to everyone involved on the plaintiff's side of this case that there are some real problems with the legal system . . . ." Counsel further argued that the case should be judged by the standards of the community in Mendocino County, not North Hollywood, where Akopyan resided. Counsel stated: "[T]he law says that we can judge this case by the standards of our community, Mendocino County, you know, not North Hollywood. You know, maybe in North Hollywood it's reasonable for a man who walked out of the emergency room on the day of the accident with three stitches to get a personal masseuse and a housekeeper for the rest of his life, but we know that's not reasonable here. Maybe it's reasonable in North Hollywood for a man to lie on the stand about an important thing like a preexisting accident and still recover some money or a lot of money. We know that's not reasonable here. Maybe it's reasonable in North Hollywood for a man to admittedly exaggerate or feign his symptoms due to a character problem and still recover big bucks, but you know, not in my town."

Akopyan contends that defense counsel's statements in closing argument constituted misconduct that justify granting a new trial. We disagree.

As an initial matter, Akopyan waived the claim by failing to interpose an objection during closing argument. (See *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 797.) We disagree with Akopyan's suggestion that an objection would have been futile. If there was anything truly objectionable in defense counsel's argument, an objection would have prevented counsel from proceeding with the argument and would have allowed the court to give a curative admonition to the jury, thereby eliminating or lessening the supposedly prejudicial effect of the argument.

In any event, we are not persuaded that the challenged statements made by defense counsel exceeded the permissible scope of argument. "In conducting closing argument, attorneys for both sides have wide latitude to discuss the case." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795.) Counsel has a right to discuss the merits of the case and to fully state counsel's views as to what the evidence shows. (*Ibid.*) Here, the thrust of

defense counsel's argument was that Akopyan was exaggerating his symptoms and had lied on the stand. Counsel also complained that Akopyan's doctors had overtreated him and should not be rewarded by the legal system for their actions. These arguments constituted permissible commentary on the evidence presented to the jury.

In the trial court, Akopyan sought a new trial on the ground that defense engaged in misconduct during closing argument. The court denied the motion, reasoning that any references to Akopyan's place of residence in North Hollywood related to whether the treatment and therapy that Akopyan received was reasonable. The court also noted that it could not recall any plea or suggestion that "the jury should consider the place of plaintiff's residence as a factor in awarding damages." We generally defer to the ruling of the trial court on a new trial motion because that court is better positioned to determine whether the verdict resulted from the asserted misconduct of counsel. (*Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174, 180–181.) Here, there is no basis to disturb the lower court's ruling or to conclude that any purported misconduct merits reversal.

**7.     *Claim that Trailmobile Was a Suspended Corporation***

As a final matter, Akopyan contends the judgment in favor of Trailmobile should be reversed because Trailmobile was a suspended corporation that had no right to defend itself. Akopyan relies upon the principle that a corporation may not prosecute or defend an action during the period of time that it is suspended for failure to pay taxes. (See *Grell v. Laci Le Beau Corp.* (1999) 73 Cal.App.4th 1300, 1306.)

Akopyan's claim fails because he cites no evidence to support his claim that Trailmobile's corporate status was suspended for failing to pay taxes. "It is the duty of [appellant] to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal. [Citation.]" (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115.) When a party fails to support its factual assertions with references to the record on appeal, we may deem the contention forfeited. (*Dietz v. Meisenheimer v. Herron* (2009) 177 Cal.App.4th 771, 800.) Further, according to Trailmobile, there is no support in the record on appeal for Akopyan's claim. Because Akopyan did not respond to Trailmobile's contention in his reply brief on appeal, we are

31

left to assume that there is no factual support in the record for the claim that Trailmobile's corporate status was suspended. It is a fundamental rule of appellate procedure that a party must affirmatively demonstrate error with an adequate record. (*Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1178.) Because there is no support in the record for Akopyan's claim, we reject it.

**DISPOSITION**

The judgment is affirmed. Defendants shall be entitled to recover their costs on appeal.

_____
McGuiness, P.J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.